# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **KENNETH MEREDITH,** | ) |
| Plaintiff, | ) Case No. 1:13CV00084 |
| v. | ) **OPINION AND ORDER** |
| **RUSSELL COUNTY SCHOOL BOARD,** | ) By: James P. Jones |
| | ) United States District Judge |
| Defendant. | ) |

*Richard F. Hawkins, III, The Hawkins Law Firm, PC, Richmond, Virginia, for Plaintiff; A. Benton Chafin, Jr., and M. Katherine Crabtree, Chafin Law Firm, P.C., Lebanon, Virginia, for Defendant.*

In this action under 42 U.S.C. § 1983, the plaintiff, a former school bus driver, claims he was fired in violation of the First Amendment, in retaliation for complaints he made regarding alleged sexual harassment of a coworker and inappropriate use of school board facilities. The school board contends he was fired for speeding and failing to stop at a railroad crossing while driving the school bus.

Following discovery, the defendant school board moved for summary judgment. The defendant's motion is ripe for decision, having been fully briefed by the parties and orally argued. For the reasons set forth below, I find that the plaintiff has failed to show the element of causation, and I will grant the defendant's motion and enter judgment in its favor.

I.

The following facts are taken from the summary judgment record.

The plaintiff, Kenneth Meredith, was first employed by the defendant, the Russell County School Board (the "Board"), as a substitute bus driver in 2007. On August 6, 2009, he became a full time bus driver.

On March 29, 2010, the plaintiff wrote a letter to Dr. Lorraine Turner, who was then the superintendent of the Russell County School Division. This letter said that one of plaintiff's coworkers, a female bus driver, had been sexually harassed some days before by a male employee.[1] The letter further explained that the female bus driver had already met with Larry Hartsock, the Division's Director of Transportation ("Director Hartsock"), and Harry Steffey, the Division's Personnel Director, to discuss the alleged harassment, but she claimed that they stated that they were not going to do anything about the alleged offender.

On July 8, 2010, the plaintiff received a fulltime employment contract with the Board for the 2010-11 school year.

In June of 2011, the plaintiff met with Director Hartsock and the Board's attorney to discuss the alleged sexual harassment incident. Around the same time,

---

[1] The letter did not describe the harassment incident (Brief in Opp'n Ex. A, ECF No. 60-1), but the plaintiff's Complaint alleges that the female bus driver was groped by a bus mechanic in the school bus garage and then sexually propositioned (Compl. ¶ 10, ECF No. 1).

the plaintiff also complained about the harassment to Charlie Collins, a Board member. During the same month, the plaintiff also complained to Collins that Director Hartsock had used a school bus mechanic at the bus garage to obtain the required annual state inspection stickers for two of his personal vehicles.

On June 27, 2011, the plaintiff received an employment contract with the Board for the 2011-12 school year. By this time, the plaintiff had made all of his complaints regarding the sexual harassment and the inspection stickers.

During the spring of 2012, Steve Dye, the Russell County Sheriff ("Sheriff Dye"), received reports that a school bus had been speeding through the small town of Cleveland, Virginia. Sheriff Dye directed two officers to monitor that area for any such activity and check vehicle speed using radar. On April 4, 2012, Sergeant Chris Parks ("Sgt. Parks") and Captain Bryant Skeen observed a bus being driven by the plaintiff, travelling forty miles per hour in a twenty-five mile-per-hour zone. The officers did not stop the bus at the time, but on April 27, 2012, a summons was issued to the plaintiff for the speeding incident.[2]

While the plaintiff admits that he was speeding, he now contends that he was speeding on April 4 because one of the students on the bus was sick. The plaintiff claimed this student was "screaming that her stomach was killing her." (Mot.

---

[2] Sgt. Parks stated during his deposition that he made a judgment call to not stop the bus because it was a minibus, and he inferred that because minibuses normally transport disabled students, those students might be traumatized by a police stop.

-3-

Summ. J. Ex. Meredith Dep. 78, ECF No. 55-18.) As such, the plaintiff argues it was necessary to get the student home as quickly as possible.

In May of 2012, Sheriff Dye attended a Board meeting so that he could inform the Board of the April 4 speeding incident. Later, Sgt. Parks requested that the Board's transportation department produce the video recordings taken from the plaintiff's bus on April 4.[3] The footage produced revealed that, in addition to speeding, the plaintiff also failed to stop at a railroad crossing while operating the bus. The plaintiff also admits this incident, but now contends that his failure to stop was excusable because he had been directed to continue over the tracks by a railroad employee.

On July 5, 2012, an additional summons was issued to the plaintiff regarding his failure to stop at the railroad crossing. The plaintiff was convicted of the two charges in traffic court, but appealed and ultimately, on June 27, 2013, entered into a plea deal with the local prosecuting attorney to have both the speeding and failure to stop charges dismissed in exchange for his agreement to attend driving school.

---

[3] The bus contained two video cameras taping the actions of the students and the driver. One showed a continuous view from the front of the bus towards the students and the other showed the front of the bus, including the driver and the opposite door. The videos also show the speed of the bus. These videos, contained on a thumb drive, are part of the summary judgment record. (Mot. Summ. J. Ex. F, ECF No. 55.)

-4-

Case 1:13-cv-00084-JPJ-PMS   Document 66   Filed 09/21/15   Page 4 of 16   Pageid#: 574

On June 4, 2012, Director Hartsock wrote a letter to C. Michael Puckett, then the Division superintendent, which recommended that the plaintiff's contract for the 2012-13 school year not be renewed.

On July 19, 2012, Dr. Brenda Hess (who had since been appointed as the acting superintendent) in turn recommended that the Board not renew the plaintiff's employment contract. Based on this recommendation, the Board voted unanimously to not renew the plaintiff's employment contract for the 2012-13 school year. Affidavits provided by Dr. Hess and each Board member in support of summary judgment assert that the plaintiff's contract was not renewed because of the two summonses and Dr. Hess' personal viewing of the video footage that corroborated the plaintiff's April 4 infractions.[4]

The plaintiff filed this action on October 28, 2013. He claims he was fired because of the complaints he made regarding the sexual harassment incident and use of the Board's facilities. He further alleges that the April 4 speeding and failure to stop charges did not actually justify the nonrenewal of his employment because (1) those actions were excusable in light of the sick child and railroad employee who directed him to cross, and (2) he was treated differently from other

---

[4] Dr. Hess also avers in her affidavit that she has now viewed videos for March 30, 2012, April 2, 2013, and April 3, 2012, and saw occasions on each of those days where Meredith failed to stop at the railroad crossing. (Hess Aff. Aug. 14, 2015, ECF No. 55-9.) In addition, she states that her recent review of the video, which also contains an audio track, shows no evidence that any child was sick or screaming or crying.

-5-

Case 1:13-cv-00084-JPJ-PMS   Document 66   Filed 09/21/15   Page 5 of 16   Pageid#: 575

bus drivers who have faced similar infractions. On the second point, the plaintiff's brief in opposition lists twelve school bus drivers who have been accused of various infractions, along with the punishment those drivers received for the infractions. (Pl.'s Mem. Opp'n 6-7, ECF No. 60). The plaintiff argues that because the Board did not terminate the employment of these drivers after their various infractions, that he was treated differently by the Board.

Of the twelve drivers referenced by the plaintiff, seven were included in plaintiff's list because of incidents that occurred while those drivers were driving their personal vehicles. Four drivers were included because they were involved in accidents that, in the determination of the Board, occurred as the result of either simple negligence or circumstances that were beyond the drivers' control. The final driver included in the plaintiff's list had dropped off a sick child without notifying that child's parents.

On May 5, 2014, with the plaintiff's consent, I dismissed Count I of plaintiff's Complaint alleging retaliation under Title VII of the Civil Rights Act of 1964. The only remaining count is for First Amendment retaliation pursuant to 42 U.S.C. § 1983. On August 14, 2015, defendant moved for summary judgment.

II.

A. Relevant Standards.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To raise a genuine issue of material fact sufficient to avoid summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is not a disfavored procedural shortcut, but an important mechanism for weeding out claims and defenses that have no factual basis. *Id.* at 327. It is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). "While government employees do not lose their constitutional rights at work, the Supreme Court has repeatedly held that the government may impose certain restraints on its employees' speech and take action against them that would be unconstitutional if applied to the general public." *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011).

In evaluating whether a public employee has stated a claim under the First Amendment for retaliatory discharge, I must consider:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's termination decision.

*McVey v. Stacy*, 157 F.3d 271, 277-78 (4th Cir. 1998). To avoid summary judgment, the plaintiff is "required to adduce evidence sufficient to show material facts in dispute as to each of the three prongs of the *McVey* test." *Adams*, 640 F.3d at 561. In the present case, the Board argues that the plaintiff failed to meet both the first and third prongs of the *McVey* test. I will address each of these arguments in turn.

B. Application of the First Prong of the *McVey* Test.

"Whether speech fairly relates to a public concern or expresses a private grievance or a matter of immediate self-interest must be determined by the content, the form, and the context of the speech." *Stroman v. Colleton Cty. Sch. Dist.,* 981 F.2d 152, 156 (4th Cir. 1992). Speech properly addresses a matter of public concern when "it affects the social, political, or general well-being of a community." *Edwards v. City of Goldsboro,* 178 F.3d 231, 246 (4th Cir. 1999). "Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee." *Stroman,* 981 F.2d at 156.

Here, plaintiff's speech concerned both the alleged sexual harassment incident and misuse of Board resources for the purpose of obtaining an inspection sticker.

"While a complaint about sexual harassment certainly can amount to a matter of public concern . . . sexual harassment or discrimination is not *always* a matter of public concern." *Campbell v. Galloway*, 483 F.3d 258, 268 (4th Cir. 2007). The Fourth Circuit has refused to articulate a bright-line rule in this area, and has instead stressed the importance of fact-specific inquiries. *Id*. at 269 (citing

*Connick v. Myers*, 461 U.S. 138, 147-48 (1983)). One variable that can be considered is whether the employee was speaking as to a pattern of discrimination or was seeking to redress a personal complaint. *Id*. at 268. In *Campbell*, a female police officer wrote a letter that mostly addressed personal grievances, but also touched on improper treatment directed toward other female officers and members of the public. *Id*. at 268-70. The Fourth Circuit held that such matters were of a public concern. *Id*. at 270.

  The plaintiff's speech in this case presents a close question. On one hand, plaintiff was not speaking to redress a personal problem, but to help a fellow employee. On the other hand, the speech mostly involved a single incident of harassment committed against a single female employee. The plaintiff's letter makes clear he was advocating on this female employee's behalf, and was not necessarily attempting to prevent a larger issue. Nonetheless, the plaintiff's letter also noted that the coworker who was allegedly guilty of sexual harassment had acted inappropriately toward other women while in the bus garage. The plaintiff's expressions regarding previous sexual harassment, coupled with the specific incident regarding his coworker, could be of interest to the public at large. As such, the plaintiff has made a prima facie showing that he was speaking about a matter of public concern.

The plaintiff further alleges that his statements regarding the misuse of Board facilities, for the purpose of obtaining an inspection sticker, related to a matter of public concern. To be sure, "corruption in a public program and misuse of state funds . . . obviously involves a matter of significant public concern." *Hunter v. Town of Mocksville, N.C.,* 789 F.3d 389, 398 (4th Cir. 2015) (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2380 (2014)). Here, the severity of the supposed corruption is minor, to say the least. Nonetheless, given the subject of the plaintiff's speech, and the fact that such speech was not attempting to address a personal problem, the plaintiff has made a prima facie case that such speech addresses a matter of public concern.

Therefore, I hold that, pursuant to the first prong of the *McVey* test, the plaintiff has made a prima face showing that he was speaking about matters of public concern.

### C. Application of the Third Prong of the *McVey* Test.

The third prong articulated in the *McVey* test, the causation requirement, is a rigorous one. *See Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990). When analyzing that requirement, "the initial burden lies with the plaintiff, who must show that his protected expression was a 'substantial' or 'motivating' factor in the employer's decision to terminate him." *Wagner v. Wheeler*, 13 F.3d 86, 90 (4th Cir. 1993).

> If the plaintiff successfully makes that showing, the defendant still may avoid liability if he can show, by a preponderance of the evidence, that the decision to terminate the plaintiff would have been made even in the absence of the protected expression, more simply, the protected speech was not the but for cause of the termination.

*Id.* A mere showing that the Board had knowledge of the protected expression is not enough to establish a causal connection. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005).

The plaintiff has produced no evidence that directly supports his contention that his contract was not renewed because of his speech. Instead, he argues that causation should be inferred because of the temporal proximity between his complaints and the nonrenewal of his contract, combined with the allegedly disparate way he was treated when compared to twelve other bus drivers who had committed traffic infractions. However, even if this evidence is taken together, with every inference made in favor of the plaintiff, it does not satisfy the causation element articulated in *McVey*.

Every specific instance of speech cited by the plaintiff in support of his claim took place in either March of 2010, when he wrote the sexual harassment letter, or June of 2011, when he attended a meeting about the sexual harassment allegations and complained that Director Hartsock improperly used Board mechanics to obtain inspection stickers. The plaintiff has not supported his

retaliatory discharge claim with any communication that took place after June of 2011.

Approximately thirteen months separate the plaintiff's speech and the Board's decision to not renew his employment contract. This span of time negates the idea that the nonrenewal of his contract was connected to his speech. *See Constantine,* 411 F.3d at 501 ("A lengthy time lapse between the [public official's] becoming aware of the protected activity and the alleged adverse . . . action . . . negates any inference that a causal connection exists between the two.") (alterations in original) (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). Courts have held that the passage of mere months is enough to negate causation when temporal proximity, and nothing more, is argued in support of causation. *See Pascual v. Lowe's Home Ctrs., Inc.,* 193 F. App'x 229, 233 (4th Cir. 2006) (unpublished) (four months); *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir. 1997) (three months); *Hughes v. Derwinski,* 967 F.2d 1168, 1174 (7th Cir. 1992) (four months).

While the Fourth Circuit has held that a plaintiff made a prima facie showing of causation, despite the passage of nine months, that decision was based largely on the fact that the employer had refused to renew the employee's contract "at the first available opportunity" to refuse a contract. *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004). In the present case, the Board did not take action at the first

-13-

Case 1:13-cv-00084-JPJ-PMS   Document 66   Filed 09/21/15   Page 13 of 16   Pageid#: 583

available opportunity. Instead, the Board renewed the plaintiff's contract for the 2010-11 school year, after the first protected communication, and also renewed his contract for the 2011-12 school year, after all protected communications had been made. The Board's failure to retaliate at the first, or even second, opportunity to do so, combined with the passage of thirteen months from the plaintiff's last protected communication to the nonrenewal of his contract, suggests temporal proximity does not support causation.

The plaintiff's evidence regarding the Board's treatment of other bus drivers is similarly unpersuasive. Of the twelve bus drivers referenced by the plaintiff, only four committed driving infractions while operating a school bus. The Board found these drivers were either involved in accidents that were outside of their control or, at the very worst, guilty of simple negligence. In contrast, the Board was presented with evidence that the plaintiff willingly drove forty miles per hour in a twenty-five-mile-per-hour zone, and willingly chose not to stop at a railroad crossing. Both decisions evidence a willful disregard for important traffic regulations.

The plaintiff's comparison between himself and the other bus drivers would only create a prima facie case if he were able to show he was similarly situated with those drivers in all material respects, but was nonetheless treated in a disparate way. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001).

To show that he was similarly situated, the plaintiff must show that the contracts of those drivers were renewed, despite those drivers having engaged in conduct that was the same as his conduct. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). In this case, the comparison between plaintiff and the other drivers is simply too dissimilar. Of the other drivers who engaged in conduct while driving a school bus, none intentionally disregarded important safety rules in the same fashion that the plaintiff did in this case.

While the plaintiff is unable to directly support his retaliatory discharge claim, the Board is able to provide a specific explanation as to why his contract was not renewed. The Board not only received information that the plaintiff drove students at an unsafe speed, but also obtained video evidence of his failure to stop at a railroad crossing. The plaintiff complains that the Board should not have taken action against him until his criminal offenses were finally adjudicated and that he received no prior notice that his contract would not be renewed. However, the evidence presented to the Board, by itself, certainly provides a legitimate reason for the Board's nonrenewal of the plaintiff's contract. There is no evidence that the Board knew at the time of the excuses the plaintiff now gives for his serious safety violations.

III.

For the foregoing reasons, it is **ORDERED** that Defendant's Motion for Summary Judgment is GRANTED. A separate final judgment will be entered forthwith.

                ENTER: September 21, 2015

                /s/ James P. Jones
                United States District Judge

-16-

Case 1:13-cv-00084-JPJ-PMS   Document 66   Filed 09/21/15   Page 16 of 16   Pageid#: 586